803 S.E.2d 731

**Stacey SELLERS, Claimant, Respondent,**

v.

**TECH SERVICE, INC., Employer, and Builders Mutual Insurance Company, Carrier, Appellants.**

Appellate Case No. 2015-001676
Opinion No. 5508

Court of Appeals of South Carolina.

Heard May 3, 2017
Filed August 9, 2017

32

Richard C. Detwiler and Jacqueline M. Pavlicek, of Callison, Tighe & Robinson, LLC, of Columbia, for Appellants.

Robert Fredrick Goings, of Goings Law Firm, LLC, of Columbia, for Respondent.

MCDONALD, J.:

In this appeal from the Appellate Panel of the South Carolina Workers' Compensation Commission (the Commission), Appellant Tech Service, Inc. (Tech Service)[1] argues the Commission erred in (1) finding Respondent Stacey Sellers was a Tech Service employee, rather than an independent contractor, at the time of his injury and (2) basing its determination on immaterial information. We affirm.

## Facts and Procedural Background

On November 8, 2013, Sellers sustained injuries while performing heating, ventilation, and air conditioning (HVAC) construction at a single-family home in the Market Commons subdivision in Myrtle Beach (City). Sellers fell from a thirty-foot extension ladder while he was "trimming out" a house and sustained injuries to his legs, back, and neck. He was subsequently hospitalized.

On November 9, Sellers notified Riverport Insurance Company (Riverport) of his accident. On November 20, Riverport's third-party claims administrator denied the claim because Sellers had "knowingly and voluntarily" excluded himself from its workers' compensation insurance policy.[2] That same day, Sellers filed a Form 50 naming Tech Service of Myrtle Beach, LLC (TSMB) as a party to his case and requesting a hearing. On December 13, 2013, Sellers filed an amended Form 50 naming Tech Service as a party.[3]

At the March 25, 2014 hearing before the single commissioner, Sellers testified he was a longtime employee of both Tech Service and TSMB and was working in the course and scope of this employment at the time of his accident. Sellers

---

**1.** Although the filings refer to both "Tech Services" and "Tech Service," owner Tracy Davis testified at his deposition that the business is actually named "Tech Service, Inc." We order that the case caption be amended accordingly.

**2.** Riverport was later dismissed from this case by consent order.

**3.** Tech Service has six to eight employees, which it shares with TSMB. Before an employee is sent to a particular jobsite, the employee is informed whether the job is for Tech Service or TSMB so he or she can record the time accordingly.

explained that his first cousin, Tracy Davis, is the owner of Tech Service and a co-owner of TSMB.

In early 2013, Sellers complained to Davis about not receiving proper overtime pay and deductions from his paycheck. According to Sellers, Davis occasionally avoided paying overtime by separating the hours Sellers worked between Tech Service and TSMB. Sellers testified Davis offered to make him a "1099 employee" and help Sellers with his taxes when he filed.[4] Sellers stated Davis gave him $1,250 in cash and instructed him to purchase his own workers' compensation insurance policy for "tax purposes only." On February 21, 2013, Sellers purchased the Riverport policy but excluded himself from it because he believed he was covered by Tech Service's policy.

In March 2013, Davis began paying Sellers without deducting for income taxes and reporting his wages using a Form 1099 rather than a Form W-2. Although Sellers performed "side work" to make extra money both before and after the March 2013 payment change, he denied signing an independent contractor agreement or otherwise changing his employment relationship with Tech Service. Beginning March 4, however, Sellers submitted weekly "Sellers Heating and Cooling" invoices to Tech Service for payment as directed by Davis.

To the contrary, Davis testified Sellers first approached him in January 2013 about his desire to work for himself as a subcontractor because he wanted to make more money. Davis denied that Sellers ever complained about not receiving proper overtime pay or deductions from his paycheck. However, Davis had no documentation reflecting the purpose and nature of his deductions from Sellers's pay. Davis told Sellers he could begin working as a subcontractor after he obtained a workers' compensation insurance policy and adamantly denied giving Sellers cash to purchase the policy. Davis explained that if he were going to give Sellers such funds, he would have given him a check to document the expenditure for his own business records. Davis learned about Sellers's accident from

---

4. 1099 refers to an IRS Form 1099-MISC, which is used to report payments made in the course of a trade or business to a person who is not an employee or to an unincorporated business.

Tech Service supervisor Jacob Hamilton. Both Hamilton and Davis told Sellers he could not file a claim under Tech Service's policy because recently audited documents reflected Sellers was a subcontractor.

By order dated August 29, 2014, the single commissioner determined Sellers was an employee of Tech Service at the time of his injury pursuant to section 42-1-130 of the South Carolina Code (2015).[5] The single commissioner dismissed TSMB. On July 17, 2015, the Commission affirmed and adopted the single commissioner's order in its entirety.

## Standard of Review

The Administrative Procedures Act (APA) establishes the standard for our review of Commission decisions. *Lark v. Bi-Lo, Inc.*, 276 S.C. 130, 135, 276 S.E.2d 304, 306 (1981). Under the APA, this court may reverse or modify the decision of the Commission when the substantial rights of the appellant have been prejudiced because "the decision is affected by an error of law or is clearly erroneous in view of the reliable, probative, and substantial evidence on the whole record." *Transp. Ins. Co. & Flagstar Corp. v. S.C. Second Injury Fund*, 389 S.C. 422, 427, 699 S.E.2d 687, 689–90 (2010); S.C. Code Ann. § 1-23-380(5)(d)–(e) (Supp. 2016). Because the existence of an employer-employee relationship is a jurisdictional question, "the [c]ourt may take its own view of the preponderance of the evidence." *Shatto v. McLeod Reg'l Med. Ctr.*, 406 S.C. 470, 475, 753 S.E.2d 416, 419 (2013) (quoting *Wilkinson ex rel. Wilkinson v. Palmetto State Transp. Co.*, 382 S.C. 295, 299, 676 S.E.2d 700, 702 (2009)). However, "this broader scope of review does not require this [c]ourt to ignore the findings of the Commission, which was in a superior position to evaluate witness credibility." *Paschal v. Price*, 392 S.C. 128, 133, 708 S.E.2d 771, 773 (2011).

---

5. In pertinent part, section 42-1-130 defines "employee" as a person "engaged in an employment under any appointment, contract of hire, or apprenticeship, expressed or implied, oral or written, including aliens and also including minors, whether lawfully or unlawfully employed, but excludes a person whose employment is both casual and not in the course of the trade, business, profession, or occupation of his employer." S.C. Code § 42-1-130 (2015).

## Law and Analysis

### I. Employment Test

 We are presented with the question of whether Sellers was, at the time of his injury, an employee of Tech Service rather than an independent contractor.[6] "No award under the Workers' Compensation Law is authorized unless the employer-employee or master-servant relationship existed at the time of the alleged injury for which [a] claim is made." *McLeod v. Piggly Wiggly Carolina Co.*, 280 S.C. 466, 469, 313 S.E.2d 38, 39 (Ct. App. 1984). "The burden of proving the relationship of employer and employee is upon the claimant, and this proof must be made by the greater weight of the evidence." *Lewis v. L.B. Dynasty*, 411 S.C. 637, 641, 770 S.E.2d 393, 395 (2015). "South Carolina's policy is to resolve jurisdictional doubts in favor of the inclusion of employers and employees under the Workers' Compensation Act." *Spivey v. D.G. Constr. Co.*, 321 S.C. 19, 21–22, 467 S.E.2d 117, 119 (Ct. App. 1996).

 "Under South Carolina law, the primary consideration in determining whether an employer/employee relationship exists is whether the alleged employer has the right to control the employee in the performance of the work and the manner in which it is done." *Paschal*, 392 S.C. at 132, 708 S.E.2d at 773. "The test is not the actual control exercised, but whether there exists the right and authority to control and direct the particular work or undertaking." *Id.* (quoting *Kilgore Grp., Inc. v. S.C. Emp't Sec. Comm'n*, 313 S.C. 65, 68, 437 S.E.2d 48, 49 (1993)). The four employment test factors regarding the right of control include: "(1) direct evidence of the right or exercise of control; (2) furnishing of equipment; (3) the method of payment; and (4) the right to fire." *Shatto*, 406 S.C. at 476, 753 S.E.2d at 419 (quoting *Wilkinson*, 382 S.C. at 299, 676 S.E.2d at 702).

---

6. "An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, without being subject to the control of his employer except as to the result of his work." *Chavis v. Watkins*, 256 S.C. 30, 32, 180 S.E.2d 648, 649 (1971) (quoting *Bates v. Legette*, 239 S.C. 25, 34–35, 121 S.E.2d 289, 293 (1961)).

In *Wilkinson*, the widow of a long-haul truck driver killed while driving his tractor filed a workers' compensation claim, contending her husband was an employee of the trucking company. 382 S.C. at 297–99, 676 S.E.2d at 701. Based on the analytical framework approved in *Dawkins v. Jordan*, 341 S.C. 434, 534 S.E.2d 700 (2000), this court found Wilkinson was an employee. *Id.* at 299, 676 S.E.2d at 701–02. Our supreme court reversed, holding Wilkinson was an independent contractor because he had entered a contract to alter his status from employee to independent contractor, carried the equivalent of his own workers' compensation policy, and owned and assumed financial responsibility for all costs associated with his tractor. *Id.* at 301–06, 676 S.E.2d at 703–06. Further, the court overruled *Dawkins*, which instructed that the presence of "any single factor is not merely indicative of, but, in practice, virtually proof of, the employment relation." *Id.* at 306–07, 676 S.E.2d at 706 (quoting *Dawkins*, 341 S.C. at 439, 534 S.E.2d at 703). Instead, the four factors "should be evaluated in an evenhanded manner" consistent with pre-*Dawkins* case law. *Id.* at 307, 676 S.E.2d at 706.

More recently in *Shatto*, a nurse anesthetist injured in a hospital operating room fall sought workers' compensation benefits as a hospital employee. 406 S.C. at 473, 753 S.E.2d at 417. While the Commission determined every factor of the employment test supported an employment relationship, this court reversed and found an independent contractor relationship. *Id.* However, the supreme court reversed, holding only the "method of payment" factor weighed in favor of the independent contractor finding. 406 S.C. at 477, 753 S.E.2d at 419–20. The court found "the other factors, especially evidence of control and furnishing of equipment, compellingly support a finding of an employment relationship." *Id.* at 477, 753 S.E.2d at 420.

## A. Direct Evidence of the Right or Exercise of Control

Tech Service argues it did not control the details of Sellers's work at the time of his injury. Yet, regardless of whether or not Tech Service exercised actual control over the details of Sellers's work, there is evidence in the record illustrating it had the *right* to exercise such control.

"While evidence of actual control exerted by a putative employer is evidence of an employment relationship, the critical inquiry is 'whether there exists the *right and authority* to control and direct the particular work or undertaking.'" *Shatto*, 406 S.C. at 477, 753 S.E.2d at 420 (quoting *Young v. Warr*, 252 S.C. 179, 189, 165 S.E.2d 797, 802 (1969)). "The right to control does not require the dictation of the thinking and manner of performing the work. It is enough if the employer has the *right* to direct the person by whom the services are to be performed, the time, place, degree, and amount of said services." *Shatto*, 406 S.C. at 477, 753 S.E.2d at 420 (quoting *Nelson v. Yellow Cab Co.*, 343 S.C. 102, 110, 538 S.E.2d 276, 280 (Ct. App. 2000), *overruled on other grounds by Wilkinson*, 382 S.C. at 300 n.3, 676 S.E.2d at 702 n.3)).

Concerning this factor, the Commission found (1) Sellers was instructed by either Davis or Hamilton on the work he was to perform and his work was supervised; (2) Sellers reported to work as he was instructed; (3) Sellers did not bid for work on any projects he performed for Tech Service, including the project on which he was working when injured; (4) Tech Service did not inform the general contractor of the project on which Sellers was injured that he was working as a subcontractor or independent contractor; (5) Tech Service directed Sellers to wear a Tech Service uniform, which he wore each work day, including the date of his injury; (6) Sellers carried Tech Service business cards and service contracts, which he executed with customers as an agent of Tech Service; and (7) Sellers had the authority to order, purchase, and pick up supplies at Gateway Supply using Tech Service's account.

We recognize some of the documentary evidence contained in the record, including Sellers's workers' compensation insurance policy, the "Sellers Heating and Cooling" invoices, and his Form 1099, supports Tech Service's argument that this was an independent contractor relationship. However, unlike in *Wilkinson*, the record in this case is devoid of an independent contractor agreement. *See* 382 S.C. at 300, 676 S.E.2d at 702 ("In evaluating the four factors, we are guided initially by the parties' independent contractor agreement."). As such, we must look to the parties' conduct in making our determination.

*See id.* ("But more importantly, we are guided by the parties' conduct, which mirrored the terms of the contract.").

A review of the record reveals Sellers reported to work in the manner in which he was instructed, whether it was to the office or a job site. He worked alongside other Tech Service employees and under supervisor Jacob Hamilton, who inspected and monitored the quality of Sellers's work product. Sellers never bid against any other subcontractors to perform HVAC construction for Tech Service. Instead, Davis informed Sellers of a particular job and "from that point he would let [Davis] know when he got it done." Either Davis or Hamilton would follow up with the customer to ensure their satisfaction with the quality of Sellers's work. If an issue arose on a project, Hamilton sent either Sellers or an hourly employee to fix it.

In addition to HVAC construction, Sellers performed service calls and sold service contracts to customers, signing as an employee and agent of Tech Service. Sellers carried Tech Service invoices with him to jobs and executed between twenty and one hundred invoices for Tech Service after March 2013. Despite Tech Service's contention that it lacked control over Sellers because he could refuse jobs and work on his own schedule—as evidenced by gaps in his work for Tech Service from March through November 2013—Davis's right to control the time, place, and amount of Sellers's work weighs heavily in favor of finding an employment relationship. *See Shatto*, 406 S.C. at 477, 753 S.E.2d at 420 ("It is enough if the employer has the *right* to direct the person by whom the services are to be performed, the time, place, degree, and amount of said services." (quoting *Nelson*, 343 S.C. at 110, 538 S.E.2d at 280, *overruled on other grounds by Wilkinson*, 382 S.C. at 300 n.3, 676 S.E.2d at 702 n.3)).

### B. Furnishing of Equipment

Tech Service contends Sellers furnished his own equipment at the time of his injury. Like the Commission, we disagree.

In deciding whether Tech Service furnished equipment to Sellers, the Commission found (1) Sellers was not financially capable of purchasing all of the tools pictured in the hearing exhibits; (2) most of the tools were purchased by Tech Service and provided to Sellers, including the ladder from which Sellers fell on the date of his accident; (3) Sellers was able to charge any supplies he needed on a Tech Service account; (4)

Sellers did not pay for any supplies out of pocket and did not have his own supply account; and (5) the evidence was unclear whether Sellers was provided a van by Tech Service.

Before March 2013, Sellers drove a Tech Service van. Sellers was not responsible for the gasoline, maintenance, insurance, or registration on the company van. In March 2013, Sellers "purchased" a used Tech Service van from Davis; however, there is some dispute as to whether Sellers ever paid any money to actually purchase the van. LeGrande Todd,[7] a cousin of both Sellers and Davis, testified he loaned Sellers $500 to buy the van. Alternatively, Sellers explained Tech Service deducted $500 from his paychecks. Davis was unable to recall whether Sellers paid with cash or a check and stated he did not have a record of the sale. Nevertheless, Tech Service was no longer responsible for the gasoline, mainte- nance, insurance, or registration on the van. *See Wilkinson*, 382 S.C. at 301–06, 676 S.E.2d at 703–06 (explaining one of the facts supporting a finding of an independent contractor rela- tionship was the claimant's ownership and assumption of financial responsibility for his tractor); *see also Shatto*, 406 S.C. at 479, 753 S.E.2d at 421 ("When it is the employer who furnishes the equipment, the inference of right of control is a matter of common sense and business." (quoting 3 Arthur Larson & Lex K. Larson, *Larson's Workers' Compensation Law* § 61.07[2] (2013))).

Sellers testified Tech Service supplied his ladder years ago and that he moved it from his company van to his personal van in March 2013. Although Sellers maintained Tech Service supplied him with other tools as well, Davis claimed Sellers accumulated the tools over the years and transferred them from his company van to his personal van when he began working as an independent contractor. After Sellers switched vans, Davis "didn't check behind him that strongly because he was family and [Davis] was trying to help him."[8]

---

7. Todd has a close relationship with Davis and helped him start Tech Service. Additionally, Todd willingly assisted Tech Service in producing documents to aid in its defense of this case but failed to produce documents Sellers requested by subpoena.

8. This testimony seems at odds with Davis's stance that Tech Service employees who performed "side work" were essentially stealing from Tech Service.

Davis admitted Sellers always wore a Tech Service uniform, including on the date of his accident. Additionally, Sellers carried Tech Service business cards. Although Sellers also had "Sellers Heating and Cooling" business cards, he claimed he primarily gave these to other Tech Service employees as an ongoing joke.

The fact that Sellers handwrote "Tech Service" on his tools, including the ladder from which he fell, should not be afforded controlling weight. The following evidence is of greater significance: (1) Tech Service provided the tools to Sellers at some point in time and (2) Tech Service either permitted Sellers to move the tools from his company van to his personal van in March 2013 or ignored the fact that he did so. Although the record reflects Sellers paid for all costs associated with the van after March 2013, it is unclear whether he actually purchased the van or Tech Service provided it to him. Because Davis testified he would have kept a record of providing funds to Sellers for his purchase of a workers' compensation insurance policy, it seems likely Davis would (or should) have also kept a record of selling the used van. Therefore, we find Tech Service's furnishing of equipment for Sellers to use while on the job favors a finding of employment.

## C. Method of Payment

Tech Service maintains the method in which it paid Sellers at the time of his injury strongly favors an independent contractor relationship. We disagree.

"When considering this prong, typically a court looks to whether the claimant was paid by the job or by the hour and how the claimant filed [his] taxes." *Lewis*, 411 S.C. at 645, 770 S.E.2d at 397. " 'Payment on a time basis is a strong indication of the status of employment,' while '[p]ayment on a completed project basis is indicative of independent contractor status.' " *Shatto*, 406 S.C. at 480, 753 S.E.2d at 421 (quoting 3 *Larson's Workers' Compensation Law* § 61.06).

The Commission found Tech Service determined both the method and amount Sellers was paid. Specifically, the Commission found Sellers's income from Tech Service after March 2013 was largely consistent with his income from prior years, and the most significant change was that Tech Service planned

to report Sellers's earnings using a Form 1099. The Commission explained, "We recognize that [Tech Service] attempted to classify him [as an independent contractor] for tax purposes under a Form 1099, instead of [an employee under] a Form W-2, but the issuance of a Form 1099 does not necessarily define an employment relationship."

Tech Service paid Sellers on a weekly basis both before and after March 2013. Before March 2013, Sellers received fourteen dollars an hour and his wages were reported on a Form W-2. However, the evidence is disputed as to how Sellers's wages were calculated. Sellers testified his hours were based on a preset amount for completion of a specified job based on the flat rate pricing book, in which hours worked would bear a relationship to the type of job performed. According to Sellers, Davis said, "I can do this by making you a 1099 employee, but if you do it faster [than the predetermined amount of time], it's actually like you are making [twenty] bucks an hour instead of [fourteen] bucks an hour." Davis maintained Sellers's hours were based on the actual time he worked and that he never paid his employees using the flat rate pricing book. Likewise, Hamilton testified Tech Service employees were paid hourly.

After March 2013, Sellers was paid on "Sellers Heating and Cooling" invoices he was directed to submit to Davis, and his wages were reported on a Form 1099.[9] Davis advised Sellers the invoices were necessary for tax purposes and they needed to "look like an invoice." Sellers explained the invoices were based on amounts set by Davis based on the amount of time Davis determined it should take to complete a job. Sellers testified that several weeks before his accident, Davis told him, "We're probably going to have to go back to paying you back by the hour like we were originally paying you."

Here, there was no employment contract, and the testimonial evidence does not clearly indicate the amount and method by which Tech Service paid Sellers. Like the Commission, we believe this suggests Sellers and Davis had a dispute regarding how Sellers's wages were being calculated. However, it is clear that Sellers received the majority of his income from

---

9. From March through November 2013, Sellers submitted more than one hundred forty invoices to Tech Service and six invoices to TSMB.

Tech Service both before and after March 2013. The only other entities from which Sellers received minimal compensation were TSMB and Todd's plumbing company. Although not as strong as the "direct evidence of the right or exercise of control" and "furnishing of equipment" factors, we find the "method of payment" evidence further weighs in favor of affirming the Commission's finding of an employment relationship between Sellers and Tech Service.

### D. Right to Fire

Tech Service argues it did not have the right to terminate Sellers without liability at the time of his injury. We disagree.

"[I]n any relationship there exists some right to terminate the arrangement." *Lewis*, 411 S.C. at 645, 770 S.E.2d at 397. "This factor is often the most problematic, for a putative employer generally has the ability to terminate both employees and independent contractors." *Shatto*, 406 S.C. at 481, 753 S.E.2d at 422. However, our supreme court has previously recognized, "The power to fire, it is often said, is the power to control. The absolute right to terminate the relationship without liability is not consistent with the concept of independent contract, under which the contractor should have the legal right to complete the project." *Id.* (quoting 3 *Larson's Workers' Compensation Law* § 61.08[1]). Essentially, the court must "look to whether liability exists if the work is prematurely interrupted." *Lewis*, 411 S.C. at 646, 770 S.E.2d at 397.

The Commission determined Tech Service had the right to terminate Sellers; however, the reasons for which Tech Service could terminate this employment relationship are unclear. Sellers testified Davis took a hard stance on employees who moonlighted by doing "side work." Yet, Sellers admitted to performing "side work" both before and after March 2013. Hamilton testified he suspected Sellers was doing "side work" before March 2013. In fact, Todd testified he hired Sellers to perform "sub work" before and after March 2013. Still, we find evidence illustrating Davis and Hamilton supervised, inspected, and monitored the quality of Sellers's work product supports the finding that Tech Service had the right to

terminate its working relationship with Sellers without liability.

Additionally, Sellers testified Davis had the right to terminate his employment with Tech Service. Sellers explained that if Davis were to terminate his employment, he would be required to seek employment from another HVAC company. In conjunction with the direct evidence of Tech Service's "right or exercise of control," we believe the "right to fire" factor further favors a finding of employment. Accordingly, we affirm the Commission's conclusion that the greater weight of the evidence supports the finding of an employment relationship between Sellers and Tech Service at the time of the accident.

## II. Immaterial Information

■■■ Tech Service contends the Commission relied heavily upon information not relevant to the four factors of the employment relationship inquiry in determining Sellers's employment status. Specifically, Tech Service argues the Commission's decision was based on immaterial information regarding (1) Sellers's lack of proper licensing at the time of his accident; (2) Tech Service's representations to the City regarding its use of subcontractors on the job where Sellers was injured; and (3) Sellers's authority to bind Tech Service to contracts with third parties.

We acknowledge representations to the public and compliance with governmental regulations are not dispositive in weighing the employment test factors. *See Shatto*, 406 S.C. at 478–79, 753 S.E.2d at 420–21 ("The presence of governmental regulations neither mandates nor forecloses a finding of an independent contractor relationship."); *id.* at 479, 753 S.E.2d at 420–21 ("Regulatory compliance, by itself, is more properly viewed in a neutral manner, one that does 'not necessarily support a conclusion of employment status.' " (quoting *Wilkinson*, 382 S.C. at 302, 676 S.E.2d at 703)). Nevertheless, the record illustrates—and the Commission recognized—several facts illustrating Tech Service held Sellers out as its employee.

In obtaining permits with the City for the job on which Sellers was injured, Tech Service represented that no subcontractors or independent contractors would be involved. City

employee Kristi Evans testified Tech Service was required to list the names of any subcontractors or independent contractors who would perform work on projects for which it pulled an HVAC permit. Even after March 2013, Tech Service listed Sellers as an employee on its internal business records. Further, Sellers is not licensed to do business individually and lacks the HVAC contractor licensing required to conduct his trade in South Carolina.

Finally, Sellers did not have his own separate supply account. He did, however, have access to a Tech Service supply account at Gateway Supply. Numerous invoices show Sellers purchased and signed for supplies on behalf of Tech Service; these included not only those supplies needed to complete Tech Service's jobs but also items typically provided by an employer to an employee, such as overalls and batteries.

We find the Commission properly applied the four factors of the employment relationship inquiry. *See Shatto*, 406 S.C. at 476, 753 S.E.2d at 419 (explaining the four employment test factors regarding the right of control). That its order references additional facts not conclusive as to employment status does not alter our determination that the Commission thoroughly analyzed the relevant facts and evaluated the employment test factors in an "evenhanded manner." *See Wilkinson*, 382 S.C. at 300, 676 S.E.2d at 702; *see id.* at 307, 676 S.E.2d at 706 ("Consistent with pre-*Dawkins*' case law, the common law factors—right or exercise of control, method of payment, furnishing of equipment and right to fire—should be evaluated in an evenhanded manner in determining whether the questioned relationship is one of employment or independent contractor.").

## Conclusion

The Commission's order determining Sellers was a Tech Service employee at the time of his injury is

**AFFIRMED.**

GEATHERS and HILL, JJ., concur.